Slip Op. 18-122

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| REBAR TRADE ACTION COALITION, | |
| Plaintiff, | |
| v. | Before: Leo M. Gordon, Judge |
| UNITED STATES, | Court No. 17-00157 |
| Defendant. | |

**OPINION**

[Final Results sustained.]

Dated: September 20, 2018

John R. Shane, Wiley Rein LLP of Washington, DC argued for Plaintiff Rebar Trade Action Coalition. With him on the briefs were Alan H. Price and Maureen E. Thorson.

Margaret J. Jantzen, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, DC argued for Defendant, United States. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of counsel was Reza Karamloo, Attorney, U.S. Department of Commerce, Office of the Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Leah N. Scarpelli, Arent Fox LLP of Washington, DC argued for Defendant-Intervenor Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. With her on the brief was Matthew M. Nolan.

Gordon, Judge: This action involves the final results of the U.S. Department of Commerce ("Commerce") in the first administrative review of the 2014 countervailing duty ("CVD") order on steel concrete reinforcing bar from the Republic of Turkey. See Steel Concrete Reinforcing Bar from the Republic of Turkey, 82 Fed. Reg. 26,907 (Dep't of Commerce June 12, 2017) (final results and partial rescission) ("Final Results"), and

accompanying Issues and Decision Memorandum for the Final Results of the Countervailing Duty 2014 Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Turkey, C-489-819 (Dep't of Commerce June 12, 2017), available at https://enforcement.trade.gov/frn/summary/turkey/2017-12108-1.pdf (last visited this date) ("Decision Memorandum"); see also Steel Concrete Reinforcing Bar from the Republic of Turkey, 79 Fed. Reg. 65,926 (Dep't of Commerce Nov. 6, 2014) (final countervailing duty order) ("Order"). Before the court is the motion for judgment on the agency record of Plaintiff Rebar Trade Action Coalition ("RTAC"). See RTAC's Mot. for J. on the Agency R., ECF No. 25 ("Pl.'s Br."); see also Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R., ECF No. 31 ("Def.'s Resp."); Def.-Intervenor Icdas Celik Enerji Tersane Ve Ulasim A.S. ("Icdas") Resp. in Opp'n to Pl.'s R. 56.2 Mot. for J. on the Agency R., ECF No. 34 ("Icdas Resp."); RTAC's Reply Br., ECF No. 36 ("Pl.'s Reply"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[1], and 28 U.S.C. § 1581(c) (2012).

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2018). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2018).

## II. Discussion

A countervailable subsidy exists if "[a government or government-affiliated entity] -- provides a financial contribution . . . to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). Under the countervailing duty regime, purchasing goods for MTAR confers a benefit, and "the adequacy of remuneration is determined in relation to prevailing market conditions for the good or service being provided in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv). As to prevailing

market conditions, Commerce considers "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." Id.

RTAC challenges Commerce's findings: (1) that the Government of Turkey ("GOT") did not make purchases of energy on the grid (there was no "financial contribution" by the GOT for more than adequate remuneration ("MTAR")); (2) that the purchases of energy by "public buyers," i.e. government or government-affiliated entities, under the GOT's "free consumer" program did not confer a "benefit" as defined under § 1677(5); and (3) that zero percent margins were appropriate for the non-selected respondents. See Pl.'s Br. For the reasons set forth below, the court sustains the Final Results.

### A. Purchase of Electricity for MTAR by the GOT through the Grid

RTAC contends that the GOT purchased electricity on the grid at above-market prices from private power producers, including Icdas and its affiliates. Plaintiff argues that the GOT's purchases were made through a state-owned enterprise—Turkish Electricity Transmission Corporation ("TEIAS"), and one of its units, the Market Financial Settlement Center ("MFSC")—that "operates as market clearance system for private sector electricity sales and purchases." See Decision Memorandum at 8, 11.

Commerce described the operation of the Turkish electricity markets as follows:

> As detailed on the record, power producers and suppliers sell electricity to unidentified third parties … via the grid through the Day Ahead Market (DAM) and the Balancing Power Market (BPM) based on the rules and procedures outlined in the Balancing Settlement Regulation (BSR). The DAM is a voluntary power exchange in which supply and demand are balanced by the bids and offers of suppliers and consumers,

> and the prices are determined according to the participants'
> bids and offers. Real-time balancing of the market occurs in
> the BPM based on bids to buy energy if the system is long and
> offers to sell energy if the system is short by generators.

Id. at 11–12 (relying on questionnaire responses of the GOT and respondents).

Commerce observed that MFSC serves as the market operator, while TEIAS is the system operator for these markets. Id. at 12. Based on the record, as well as its own analysis of the laws governing the Turkish electricity markets, Commerce found "that neither TEIAS nor MFSC sets the price for electricity, but rather administers the system through which the market prices are determined." Id. Commerce explained that, because third parties buy and sell electricity from the pool, "none of the market participants know to whom they sold or from whom they purchased electricity." Id. at 13. Commerce found that TEIAS, as the system operator, "calculates the amount of receivables and payables to be accrued and prepares the related invoices," which are ultimately handled by "participating banks, which provide the cash exchange services." Id. Commerce further found that TEIAS "can neither make losses nor earn profits from its activities and does not have cash flow, other than the collection of transmission fees and system utilization charges." Id. Commerce thus determined that while TEIAS and MFSC were responsible for settling transactions and providing invoices of the payables and receivables for the market participants, neither was engaged in the purchase or sale of electricity. Id.

### 1.  GOT's Questionnaire Responses

RTAC challenges Commerce's finding that the GOT and TEIAS did not purchase electricity on the grid. RTAC argues that Commerce failed "to adequately support its acceptance of the GOT's statement that the GOT does not pay for this electricity." Pl.'s Br. at 19. RTAC bases its argument on the GOT's questionnaire responses indicating that TEIAS "procure[s]" electricity from the grid to ensure balancing of the system and maintenance of adequate reserves. Id. at 19–20.

Commerce directly addressed and rejected RTAC's argument. See Decision Memorandum at 13–14. In rejecting RTAC's argument, Commerce relied on the GOT's explanation that the BSR authorized TEIAS to obtain electricity capacity reserves and use reserve balancing tools to maintain "reserve capacity in the power plants should the system need to be balanced." Id. at 14. Commerce found that the GOT's explanation was consistent with TEIAS' 2014 annual report, Icdas' submitted sales data, and other record evidence indicating that "while TEIAS does collect transmission and system utilization and usage fees, TEIAS has otherwise no inflow or outflow of money with regard to the electricity purchase transactions between the sellers and buyers." Id. at 13. Consequently, Commerce determined that, despite RTAC's argument to the contrary, the "GOT's description of TEIAS' ancillary responsibility … did not serve as evidence that TEIAS pays for or sets the prices for electricity." Id. This strikes the court as reasonable fact finding on the administrative record. Commerce reasonably credited the GOT's explanations that TEIAS did not pay for or set the prices for electricity (direct record evidence) rather than indulge RTAC's hoped-for inferences (and lack of direct record

evidence) that TEIAS did pay for or set prices for electricity. See Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Technical, Salaried & Mach. Workers, AFL–CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993) ("The question is whether the record adequately supports the decision of [Commerce], not whether some other inference could reasonably have been drawn.").

## 2.  2015 World Bank Study

RTAC contends that Commerce's determination is unsupported by substantial evidence because it is incompatible with information in the record indicating that the GOT purchases electricity on the grid. Pl.'s Br. at 19–20. RTAC points to statements from a 2015 World Bank study indicating that the GOT pays for energy and argues that Commerce failed to consider this information. Id. at 20. RTAC relies on the part of the study that states that "Ancillary Services may provide additional revenue for the generators. These services are used for a reliable power system operation and are provided through ancillary service agreement with TEİAŞ." Id. (quoting the 2015 World Bank study). Although RTAC concedes that this language does not provide direct evidence that the GOT purchases energy, it nevertheless argues that "[i]t is hard to conceive how the GOT would not be the buyer – and therefore the payor – in such situations." Id. RTAC's argument also ignores Turkish law, which, as expressly noted by Commerce, prohibits TEIAS from incurring "any loss or profit" for its operation of the wholesale electricity market. See Decision Memorandum at 13 (quoting Article 9(a) of the BSR). Here again RTAC is looking for Commerce to share its hoped-for inferences about the administrative record.

The primary problem for RTAC is that it failed to unearth direct record evidence that the GOT makes payments for TEIAS' procurement of energy reserves. Similarly, RTAC pointed to no information supporting its suggestion that TEIAS actually engaged in commercial activity on the Turkish electricity markets. See Pl.'s Br. at 20 (arguing that record did "not indicate that TEIAS is not permitted to buy or sell on those markets" but providing no affirmative evidence that TEIAS engaged in any commercial activity in energy markets). RTAC's argument requires Commerce to (1) rely on the 2015 World Bank study, (2) adopt RTAC's preferred inference that the GOT used the price equalization mechanism to make payments for electricity, and (3) ignore information on the record conflicting with that inference. See Decision Memorandum at 15 (noting that RTAC submitted conflicting studies as to whether the price equalization mechanism of the national tariff system is evidence that the GOT purchases electricity). Considering the entirety of the record, the court concludes RTAC has failed to establish that a reasonable mind would have to credit RTAC's position as the one and only correct position on the administrative record. The record more than adequately supports Commerce's conclusion that "the price equalization mechanism of the national tariff system" does not mandate "that the government purchases electricity for MTAR from power producers." See id.; see also Daewoo, 6 F.3d at 1520. The court therefore sustains Commerce's finding that TEIAS did not pay for or set the prices for electricity.

### 3.  2011 Study & 2014 Study

RTAC next argues that Commerce's analysis of two Turkish electricity market studies is unreasonable. See Pl.'s Br. at 21–23. RTAC argued in its administrative case

brief that an International Energy Law Review study ("2011 study") "indicated that the higher prices in the TEIAS-run wholesale markets led Turkish power producers to rely less heavily on bilateral contracts and more heavily on the TEIAS-run markets." Id. at 21. RTAC maintained that this study "indicates that sellers have favored the government-run wholesale markets over bilateral contracts." Id. RTAC also argues that Commerce failed to provide a "satisfactory explanation" for its rejection of the 2011 study's findings. Id. at 22 (quoting Baroque Timber Indus. (Zongshan) Co. v. United States, 35 CIT ___, ___, 971 F. Supp. 3d 1333, 1339–40 (2014) (internal citations omitted)). The court disagrees. Commerce considered RTAC's argument and rejected it.

        Commerce found that RTAC's proffered study was published in 2011, and that it "relies on observations and conclusions obtained from other sources that were published in 2007 and 2010." Decision Memorandum at 14. Commerce further found that "the study evaluates the Turkish electricity market under the Electricity Market Law 2001; however, during the POR, the electricity market operated under the Electricity Market Law (Law No. 6446), which entered into force on March 30, 2013." Id. As a result, Commerce determined that "the descriptions and conclusions of the secondary market presented in the study published in the International Energy Law Review are not relevant to or contemporaneous with the 2014 POR." Commerce also found that "more recent studies placed on the record contradict the observations of the [2011] study." As an example, Commerce noted that "an article published in the International Journal of Energy Economics and Policy in 2014 [("2014 study")], states that 'The electricity market is based on bilateral agreements complemented with the balancing and settlement market.'"

Id. at 14–15. Lastly, Commerce determined that the findings of the 2011 study cited by RTAC "are not substantiated by Icdas' electricity sales activity during the POR." Id. at 15.

RTAC contends that Commerce's findings as to the 2011 study are unsupported by substantial evidence because Commerce treated the study "in contradictory ways." See Pl.'s Br. at 18–19, 23–25. Commerce determined that the 2011 study did not warrant a conclusion that the GOT engaged in purchasing electricity from the grid, in part because the 2011 study reflected data not contemporaneous with the POR. Decision Memorandum at 14. RTAC takes issue with the fact that although Commerce appeared to reject any consideration of the 2011 study due to its lack of contemporaneity with the POR, Commerce nonetheless cited the 2011 study to explain why the GOT's adoption of a national tariff system supported by a price equalization mechanism for its electricity markets did not serve as evidence that the GOT purchased electricity from the grid at MTAR. See Pl.'s Br. at 23–25; Decision Memorandum at 15. RTAC's argument that Commerce treated the 2011 study inconsistently is without merit. Commerce only mentioned the 2011 study as "yet another article … placed on the record by the petitioner" that demonstrated RTAC's reliance on contradictory and irrelevant sources. See Decision Memorandum at 15.

RTAC further contends that Commerce's reliance on the 2014 study as a basis for rejecting the findings of the 2011 study was unreasonable because "there is no apparent contradiction between the two sources." Pl.'s Br. at 21. RTAC suggests that Commerce misread the 2011 study by assuming that the 2011 study refers to the DAM as the

"primary" market and the BPM as the "secondary" market. <u>Id.</u> at 22; <u>Decision Memorandum</u> at 14.

RTAC argues that the 2011 study's references to a "secondary" market were intended to describe both TEIAS-run wholesale markets (DAM & BPM), as compared to a "primary" market consisting of "bilateral contracts." <u>See</u> Pl.'s Br. at 22. RTAC, however, offers no basis for its "careful reading of the study." <u>Id.</u> Rather, RTAC merely notes that other documents in the record treat the DAM and BPM "as parts of a single balancing mechanism." <u>Id.</u> at 22 n.9. Beyond this vague statement, RTAC offers no support for its argument that Commerce unreasonably interpreted the "secondary" market described in the 2011 study to refer only to the BPM as opposed to both the DAM and BPM. Rather than demonstrate that its interpretation of the 2011 study is the one and only reasonable interpretation of the study (such that a reasonable mind would have to adopt it), RTAC can only suggest there may be some murkiness, which leaves RTAC once again peddling hoped-for inferences.

One final observation. Even assuming Commerce somehow misinterpreted the 2011 study, RTAC fails to address Commerce's rejection of the findings of the 2011 study as "not substantiated by Icdas' electricity sales activity during the POR." <u>See</u> <u>Decision Memorandum</u> at 15. Commerce's determination that Icdas' electricity sales activity during the POR did not corroborate the 2011 study's findings provides an independent basis for Commerce's rejection of the 2011 study. And RTAC does not address it.

The court therefore sustains Commerce's determination that there were no government purchases of electricity on the grid for MTAR.

### B. Purchase of Electricity for MTAR by Public Buyers

RTAC challenges Commerce's finding that purchases of energy by public buyers from Icdas under the "free consumer" program were not at MTAR as unsupported by substantial evidence. Pl.'s Br. at 2–13. RTAC argues that this finding was unreasonable based on a three-point chain of logic: (1) the rates of the National Price Schedules ("NPS") used as the basis for the prices of electricity purchases by public buyers under the "free consumer" program were government-determined; (2) there was no evidence that these government-determined prices were market-based prices; and (3) Commerce's determination that Icdas did not receive MTAR from public buyers was unreasonable as a result of Commerce's failure to identify how the NPS-based prices were "market-based." Pl.'s Br. at 8–13 (citing Decision Memorandum at 16).

To better understand the Turkish "free consumer" program and Icdas' sales to public buyers, Commerce issued post-preliminary questionnaires to the GOT and Icdas. See Memorandum re: Administrative Review of the Countervailing Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey (Dep't of Commerce Mar. 3, 2017), PD 291, CD 266[2] ("Post-Prelim Analysis"). "Both public and private end-users that consume an annual quantity above the ["Free Consumer Limit" set by the Energy Market Regulatory Authority ("EMRA")] are defined as 'free consumers' and can obtain their electricity from a supplier of their choice other than the local distribution company for their

---

[2] "PD" refers to a document contained in the public administrative record, which is found in ECF No. 20-1, unless otherwise noted. "CD" refers to a document contained in the confidential administrative record, which is found in ECF No. 20-2, unless otherwise noted.

area." Id. at 2. Icdas reported that "in addition to selling electricity to wholesale companies

under bilateral agreements and selling electricity through the grid, [Icdas also sells]

electricity to free consumers via contracts." Id. Commerce found that the prices for sales

to "free consumers" were set by contract that provided discounts on the prices set out in

the NPS applicable to standard end-user sales of energy. Id. at 3. Commerce found that

Icdas' sales to public buyers were not at MTAR because they were priced according to

contractually agreed-upon discounts from the reference prices in the NPS. Id.

In their briefs, Plaintiff, Defendant, and Defendant-Intervenor all look to

Commerce's less than adequate remuneration ("LTAR") regulation, 19 C.F.R. § 351.511,

to analyze whether energy purchases by public buyers under the "free consumer"

program were at MTAR. See Pl.'s Br. at 2–3; Def.'s Resp. at 12–13; Icdas Resp. at 11.

Commerce though did not mention § 351.511, see Decision Memorandum, apparently

with good reason, because in its CVD rulemaking, Commerce acknowledged a lack of

sufficient experience with procurement subsidies and would not issue "regulations

concerning the government purchase of goods," i.e., purchases for MTAR. Countervailing

Duties, 63 Fed. Reg. 65,348, 65,379 (Dep't of Commerce Nov. 25, 1998) (preamble to

final rulemaking adopting 19 C.F.R § 351.512 as "reserved").

Leaving § 351.511 to the side, the court addresses the balance of the parties'

arguments on the issue. RTAC argues that the GOT controls the market and sets the

market rates, including the electricity prices published in the NPS. Pl.'s Br. at 9–10.

Specifically, RTAC contends that EMRA, which sets the electricity prices, is a government

agency. Id. at 9. Defendant responds that the record supports a finding that EMRA is

independent of government control, citing to a 2015 World Bank Study as demonstrating that "EMRA is not simply an arm of the Turkish government but instead operates independently of government control, and on market principles." Def.'s Resp. at 11–12. RTAC counters that Commerce "did not cite this study, identify any information obtained from it, or explain how such information supported its conclusion…. Nor did [Commerce] claim that EMRA was not part of the Turkish Government, was otherwise 'independent' of the Turkish Government, or operated on 'market principles.' Thus, the United States' defense is post hoc." Pl.'s Reply at 3 (citing Burlington Truck Lines, Inc., 371 U.S. at 168–69). RTAC is correct, and the court may not entertain Defendant's post hoc rationale. Nevertheless, the GOT's control of EMRA does not mean that NPS prices are not market-based, much less that the discounted-NPS prices determined and paid pursuant to contracts between respondent private power producers and public buyers are not market-based. See Decision Memorandum at 16 (citing Post-Prelim Analysis).

RTAC maintains that the record does not support a finding by Commerce that the prices of electricity purchases from Icdas, discounted from those set forth in the NPS, were not at MTAR. Pl.'s Br. at 9, 12. RTAC contends that Commerce's finding rested on an unreasonable assumption that prices provided in the NPS were market-based. Id. RTAC argues that because EMRA is a government agency and maintains ultimate authority over setting the NPS, NPS rates are "government-determined" and cannot reasonably be described as "market-based." Id. at 9–11. RTAC's arguments, however, ignore the fact that the public buyers' purchases at issue were not priced solely according to the NPS, but rather they were priced pursuant to contracts negotiated by the public

buyers with Icdas and other private power suppliers. <u>See</u> Post-Prelim Analysis at 2. Commerce explained that under the "free consumer" program the public buyers "obtain electricity from a supplier <u>of their choice</u> other than the local distribution company for their area." <u>Id.</u> (emphasis added). Commerce also noted that "the contracts between free consumers and supplier companies are not subject to the approval of EMRA." <u>Id.</u>

In its Post-Prelim Analysis, Commerce described how "free consumer" contracts are created: "a free consumer, which wants to select its electricity supplier, either makes a tender or requests proposals to evaluate offers of electricity in order to determine the lowest price provider." <u>Id.</u> at 3. Commerce further noted that "free consumers prefer to buy electricity from suppliers rather than their assigned local distributors because suppliers can provide a discount off of the rates posted in the [NPS], while the local distribution companies adhere to the [NPS]." <u>Id.</u> In summary, Commerce explained that the prices in "free consumer" contracts were reached through competitive market activity that resulted in lower prices for the consumers than were offered through the government-set NPS. After explaining how the Turkish "free consumer" market for electricity purchases operates, Commerce found that NPS-discounted prices in the "free consumer" contracts at issue resulted from competitive market activity. Because the public buyers purchased electricity from ICDAS at negotiated prices lower than government-determined prices set in the NPS, Commerce reasonably concluded that these prices did "not give rise to any benefit <u>per se</u> in terms of payment at MTAR." <u>Id.</u> While Commerce's ultimate determination is not a paragon of clarity, the court can reasonably discern that Commerce followed and adopted the reasoning of the Post-Prelim Analysis. <u>See</u> <u>Bowman</u>

Transp., Inc. v. Arkansas–Best Freight Sys. Inc., 419 U.S. 281, 285–86, (1974) (a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."); Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998).

RTAC suggests that EMRA could have set the NPS prices so high that even the discounted prices reached in "free consumer" contracts nevertheless represented MTAR as compared to contract prices that would be reached in a truly free market context. See Pl.'s Br. at 12–13 (providing simplified example where hypothetical market situation could result in payments of MTAR). RTAC though fails to identify any record evidence "to indicate that the NPS electricity rates are not market-based prices," much less any evidence that would corroborate a finding that NPS prices were so high above market-based rates that the negotiated discounts in "free consumer" contracts nevertheless provided MTAR. Decision Memorandum at 16. Absent that evidence, Commerce reasonably found that public buyers' energy purchases were not at MTAR because they were priced according to contractually agreed upon discounts from the rates set in the NPS. Accordingly, the court sustains Commerce's determination that the "'Purchase of Electricity for MTAR – Sales to Public Buyers' does not constitute a countervailable subsidy."

### C. Zero Percent Rates for Non-Selected Respondents

RTAC notes that "the agency's determination of the net subsidy rate applicable to non-selected respondents flowed directly from its determination of the net subsidy rates applicable to the mandatory respondents." Pl.'s Br. at 28. Accordingly, because the court

sustains Commerce's determinations with respect to the net subsidy rates for the mandatory respondents, the court also sustains the derivative zero percent net subsidy rates for the non-selected respondents.

### III. Conclusion

For the reasons set forth above, the court sustains the <u>Final Results</u>. Judgment will be entered accordingly.

      /s/ Leo M. Gordon
Judge Leo M. Gordon

Dated: September 20, 2018
     New York, New York